UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRYANT BROWN[1] and HRATCH
YEREMIAN,

              Plaintiffs,

                                    Case No.: 2:22-cv-12978

v.                                    Hon. Gershwin A. Drain

MGM GRAND CASINO,

              Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#33] AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#34]

### I.     INTRODUCTION

Plaintiff Hratch Yeremian ("Plaintiff") filed the instant complaint against his former employer, MGM Grand Detroit ("Defendant"), alleging that Defendant failed to accommodate his religion under Title VII and subjected him to disparate treatment discrimination under Title VII and the Elliot-Larsen Civil Rights Act ("ELCRA"),

---

[1] Bryant Brown's claims were dismissed with prejudice on August 20, 2024 via stipulation of the parties. Therefore, this Opinion and Order addresses only Hratch Yeremian's claims.

when it terminated his employment for his refusal to comply with Defendant's mandatory COVID-19 vaccination policy. ECF No. 11, PageID.109–114. Presently before the Court is Plaintiff's Motion for Partial Summary Judgment[2] and Defendant's Motion for Summary Judgment. ECF No. 33; ECF No. 34. Both Motions have been fully briefed. The Court concludes that oral argument will not aid in the disposition of these Motions and, accordingly, will determine the outcome on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the following reasons, the Court concludes that Plaintiff's Motion for Partial Summary Judgment must be DENIED. Conversely, the Court concludes that Defendant's Motion for Summary Judgment must be DENIED IN PART and GRANTED IN PART. Specifically, the Court concludes that Defendant's Motion as it pertains to Count I (Failure to Accommodate) is denied, and its Motion as it pertains to Counts II and III (Disparate Treatment under Title VII and the ELCRA) is granted.

## II.   BACKGROUND

Defendant MGM Grand Detroit is a hotel and casino that features gaming, dining, and other attractions. ECF No. 34, PageID.1610. Defendant has more than 2,200 employees. ECF No. 34-2, PageID.1640. Plaintiff was a longtime salaried employee of Defendant, having worked various positions with the company since

---

[2] Plaintiff seeks only partial summary judgment because he states that the issue of damages needs to go to trial. ECF No. 33, PageID.1199.

June 1999. ECF No. 33, PageID.1200; ECF No. 33-6, PageID.1287–88. Plaintiff consistently received "glowing" reviews from his colleagues throughout his tenure at the company. *See* ECF No. 33, PageID.1201; ECF 33-4. Beginning in 2019, Plaintiff worked as the Warehouse Manager. ECF No. 33-6, PageID.1288. Defendant considers the Warehouse a "vital" department to its operations, noting that it is the place through which all essential inventory to the entire property flows—such as food, drinks, toilet paper, gloves, and cleaning products. ECF No. 34-4, PageID.1687. As the Warehouse Manager, Plaintiff was responsible for purchasing, inventory control, distributing inventory across the property, accounts payable, and managing the department's 15–25 employees. ECF No. 33-6, PageID.1285–86; ECF No. 34, PageID.1687. The only other salaried management-level employee in the Warehouse was Bryant Brown, who had the title of Warehouse Supervisor. ECF No. 34-5, PageID.1701. Plaintiff stated that if the Warehouse could not operate, it would be a "disaster" for Defendant's operations. ECF No. 33-6, PageID.1301.

### a. Defendant's COVID-19 Vaccination Policy

In 2020, the global COVID-19 pandemic struck. In March of that year, the State of Michigan required Defendant to temporarily shut down. ECF No. 34-6. Plaintiff was designated as an essential employee during this time and continued to work throughout the pandemic when others were laid off. ECF No. 33-5; ECF No. 34-3, PageID.1669. Defendant was permitted to reopen in August 2020 at 15%

capacity, but it was forced to close again in November for two months due to surging infection rates. ECF No. 34-7; ECF No. 34-8; ECF No. 34-4, PageID.1688; ECF No. 34-5, PageID.1725. In August 2021, Defendant announced a mandatory COVID-19 vaccination policy for its salaried and newly hired employees, requiring proof of vaccination for salaried employees by October 15, 2021. ECF No. 34-10. It relied on state and federal agencies such as the Centers for Disease Control and Prevention, the Michigan Department of Health and Human Services, and more to formulate its policy. ECF No. 34-7. Defendant indicated, however, that it would consider employee requests to be exempt from the policy or for accommodations to the policy. ECF No. 34-11. Absent a granted exemption or accommodation, Defendant informed employees that they would be subject to disciplinary action or termination for failing to comply with the policy. *Id.*

Defendant's vaccination policy did not apply to existing hourly workers, all of whom were unionized. *See* ECF No. 38, PageID.2235. Because the union employees were subject to a collective bargaining agreement, Defendant could not unilaterally impose the vaccination policy on them. ECF 34, PageID.1614; ECF No. 38, PageID.2235. Defendant attempted to obtain the union's compliance, but it was unable to negotiate an agreement on the policy. ECF No. 34-1, PageID.1642; ECF No. 38, pageID.2235. Thus, Defendant's union workers—who hold many different positions at the hotel and casino, such as cooks, servers, maintenance workers,

housekeepers, cashiers, and dealers, just to name a few—were not subject to the vaccination policy. ECF No. 34-4, PageID.1681; ECF No. 34-2, PageID.1642; ECF No. 33-3, PageID.1239. In fact, around 80% of Defendant's workforce was unionized. ECF No. 34-2, PageID.1642. Further, all of Defendant's Warehouse workers aside from Plaintiff and Bryant Brown were union workers. ECF No. 33-3, PageID.1240.

After rolling out the vaccination policy, Defendant granted one new hire's request for accommodation on medical grounds. *See* ECF No. 33-18.[3] That individual, who was hired as a Dealer Trainee and granted an accommodation in December 2021, was required to wear a face mask, social distance, and submit weekly COVID-19 PCR testing in lieu of the vaccination. *Id.*

### b. Plaintiff's Religious Accommodation Request

Plaintiff identifies as an Orthodox Apostolic Christian. ECF No. 33-6, PageID.1289. Plaintiff timely submitted a religious accommodation request to the vaccination policy. ECF No. 33-7. He indicated that he has "a sincere religious belief," and "oppose[s] as a matter of religious conviction, to be inoculated with the vaccine against [his] will." *Id.* He suggested continued social distancing, mask wearing, and remote working where possible as potential measures Defendant could

---

[3] The individual developed Bell's palsy after the first dose of the COVID-19 vaccination. As such, he was unable to take the second dose. *See* ECF No. 33-18, PageID.1441.

take to accommodate his religious belief. *Id.* Defendant responded by asking Plaintiff for more information. ECF No. 33-9.

Plaintiff replied by submitting a formal COVID-19 Religious Accommodation Request Form. ECF No. 33-10. The form asked Plaintiff to "identify the religious belief, practice, or observance" that caused him to seek an accommodation. *Id.* at PageID.1357. Plaintiff responded that he is seeking an accommodation because to receive the vaccine "would violate [his] religious beliefs." *Id.* The form next asked Plaintiff to "describe the conflict between such religious belief, practice, or observance and the provision(s) of the COVID-19 vaccination program." *Id.* Plaintiff responded, "[t]he conflict is that all of the currently available [COVID-19] vaccines used cell lines originating from aborted children in their manufacturing or testing." *Id.* The form then asked Plaintiff to "describe the basis" for his religious belief that he identified. *Id.* He answered that he "believe[s] that life begins at conception and ends at natural death, and [he] would be cooperating with and complicit in abortion if [he were] to receive the vaccine." *Id.* Further, Plaintiff indicated that he "would be morally held accountable by God" if he were forced to get the vaccine. *Id.* at PageID.1358. When asked whether his beliefs impact other areas of his life—particularly as it pertains to whether he receives other medical care—he responded that his "medical care would be affected" if he took any medication or vaccine originating from fetal cell lines. *Id.*

6

Ultimately, Defendant denied Plaintiff's request. In its denial letter, Defendant expressed doubt about the sincerity of Plaintiff's religious belief, noting that Plaintiff neglected to bring up his objection to the use of fetal cells in his original accommodation request, and brought it up for the first time in his response to Defendant's request for more information. ECF No. 34-15. It also expressed doubt about whether Plaintiff's belief is religious in nature or purely secular. *Id.* However, Defendant "assumed, without conceding," that Plaintiff possessed a sincere religious belief. *Id.* Nevertheless, Defendant determined that accommodating Plaintiff would impose an undue burden on Defendant's operations and denied his request on those grounds. *Id.* It noted that Plaintiff is the leader of his team, and that his job requires him to work on the property and interact closely with many employees and third parties. *Id.* Defendant stated that social distancing, masking, and other mitigation efforts would be insufficient or impossible at times, and that regular COVID-19 testing would not provide sufficient protection for employees, guests, and customers "due to gaps in time between tests." *Id.*

Plaintiff attempted to convince Defendant to reconsider. He stated that he "firmly stand[s]" behind his beliefs that the vaccines, which are "produced or validated" with "aborted fetal cell tissues," violate his religious convictions. ECF No. 33-13; ECF No. 33-15, PageID.1404. He also indicated that his faith requires him to "treat [his] body as [his] temple" and that being "coerced" into injecting a

substance that has not undergone multi-year testing is a danger to his "spiritual and emotional wellbeing." ECF No. 33-15, PageID.1404. Defendant responded that its decision to deny the accommodation was final. *Id.* at PageID.1403; ECF No. 33-14, PageID.1400. Ultimately, Plaintiff was terminated on October 16, 2021 for failing to comply with the vaccination policy. ECF No. 33-6, PageID.1310.

### c.  The Lawsuit

After his termination, Plaintiff filed the instant action, alleging that Defendant violated his rights by failing to accommodate his religion and by subjecting him to disparate treatment discrimination. ECF No. 11. The parties have completed discovery and have now filed cross motions for summary judgment, which are presently before the Court. ECF No 33; ECF No. 34. Plaintiff argues that there is no genuine issue of material fact that Defendant failed to accommodate his religious beliefs under Title VII because (1) he has proven that he has a sincere religious belief, (2) Defendant did not offer Plaintiff any accommodation, and (3) Defendant has failed to show that it would have suffered undue hardship to accommodate Plaintiff. *See* ECF No. 33. In contrast, Defendant argues that (1) Plaintiff has not shown that he has a sincere religious belief, and (2) Defendant has demonstrated that it would have incurred undue hardship to accommodate Plaintiff. Therefore, Plaintiff's failure to accommodate claim fails as a matter of law. *See* ECF No. 34.

Plaintiff further argues that there is no genuine issue of material fact remaining that Defendant subjected him to disparate treatment discrimination under Title VII and the ELCRA. He argues that he established his prima facie case, and that he has proven as a matter of law that Defendant's nondiscriminatory reason for his discharge is pretext. *See* ECF No. 33. Conversely, Defendant argues that Plaintiff has not established his prima facie case because he has neither proven that he has a religious belief, nor that he was treated differently than similarly situated employees. Further, MGM argues that even if Plaintiff did establish his prima facie case, he did not establish that Defendant's nondiscriminatory reason for his discharge was pretext. *See* ECF No. 34.

## III. LAW & ANALYSIS

### a. Summary Judgment Standard

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When analyzing a summary judgment motion, the inquiry that a court performs is "the threshold inquiry of determining whether there is a need for a trial[,]" or in other words, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 251–52 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," by identifying portions of the record and the evidence that demonstrates an absence of a genuine, material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The court "must construe all reasonable inferences in favor of the nonmoving party" when conducting its analysis. *Tepper v. Potter*, 505 F.3d 508, 513 (6th Cir. 2007).

Notably, "the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts…. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**b. Failure to Accommodate**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, states in relevant part:

> It shall be an unlawful employment practice for an employer… to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… religion[.]

42 U.S.C. § 2000e-2(a)(1). "Religion" is defined in the statute as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's… religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). The Supreme Court has clarified that Title VII demands more than "mere neutrality" toward employees' religious practices; rather, it gives religious practices "favored treatment," "affirmatively obligating" employers to provide religious accommodations so long as they do not impose an undue hardship on the employer. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015).

To analyze a religious accommodation claim under Title VII, a court "begins with the question of whether the employee has established a prima facie case of religious discrimination." *Tepper*, 505 F.3d at 514 (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)). To establish a prima facie case, the plaintiff must show that (1) he holds a sincere religious belief that conflicts with an employment requirement, (2) he informed the employer about the conflict, and (3) he was discharged or disciplined for failing to comply with the conflicting

requirement. *Id.* Once the plaintiff establishes his prima facie case, the burden shifts to the employer "to show that it could not reasonably accommodate the employee without undue hardship." *Id.* (quoting *Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)).

### i. Sincere Religious Belief

To prevail on a failure to accommodate claim, a plaintiff must prove that the belief for which protection is sought is religious in the plaintiff's "own scheme of things," and that the belief is sincerely held. *Speer v. UCOR LLC*, No. 3:22-cv-426, 2024 WL 4370773, at *5 (E.D. Tenn. Oct. 1, 2024) (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978)). Regarding whether a belief is "religious," courts are "not [t]o question the veracity of one's religious beliefs." *Sturgill v. Am. Red Cross*, 114 F.4th 803, 809 (6th Cir. 2024); *see also Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). A religious belief need not be "acceptable, logical, consistent, or comprehensible" to be protected. *DeVore v. Univ. of Ky. Bd. of Trustees*, 118 F.4th 839, 846 (6th Cir. 2024) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)). However, Title VII offers no protection for "purely secular beliefs, such as those that are essentially political, sociological, or philosophical, a matter of personal preference, or the product of a merely personal

moral code." *DeVore*, 118 F.4th at 845 (quoting *Welsh v. United States*, 398 U.S. 333, 342–43 (1970)) (internal quotation marks omitted). Regardless, "[i]n such an intensely personal area… the claim of the [plaintiff] that his belief is an essential part of a religious faith must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184 (1965).

Regarding whether a belief is sincere, a court must determine that the plaintiff sincerely holds the belief, and that it is not merely a "pretextual assertion of a religious belief in order to obtain an accommodation." *Speer*, 2024 WL 4370773, at *6 (quoting *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 717 n.28 (2014)) (internal brackets omitted); *see also Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (a request for an accommodation "must be sincerely based on a religious belief and not some other motivation."). "The sincerity inquiry is almost exclusively a credibility assessment," and "must be handled with a light touch, or judicial shyness." *Spencer v. Blue Cross Blue Shield of Mich.*, No. 23-cv-11913, 2024 WL 3755979, at *3 (E.D. Mich. Aug. 12, 2024) (cleaned up). The factfinder may consider "factors like length of adherence [to a religious belief], knowledge about the belief system, and the existence of religious literature and teachings supporting the belief," as well as whether the plaintiff has "wavered in [his] dedication" to his beliefs. *Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021).

The parties contest whether Plaintiff holds a sincere religious belief that conflicted with taking the COVID-19 vaccination. Plaintiff's beliefs boil down to the following: (1) it goes against his beliefs to be vaccinated against his will, (2) it goes against his belief that life begins at conception to receive a vaccination that was manufactured or tested using aborted fetal cell lines, and (3) it goes against his belief that his body is a temple to receive a vaccine that has not undergone extensive testing. ECF No. 33-7; ECF No. 33-10; ECF No. 33-15, PageID.1404.

The Court begins with Plaintiff's objection to the vaccination policy based on the use of fetal cell lines in manufacturing or testing the vaccines. When requesting an accommodation, Plaintiff informed Defendant that the use of fetal cell lines to manufacture or test the vaccines goes against his religious convictions because he believes that "life begins at conception and ends at natural death," and that he would be "cooperating with and complicit in abortion" and "morally held accountable by God" if he received the vaccine. ECF No. 33-10, PageID.1357–58. Defendant argues that this explanation is insufficient because Plaintiff did not connect this belief "to his wider religious outlook" or a "religious observance or practice" that conflicted with the vaccine. ECF No. 34, PageID.1626; ECF No. 38, PageID.2245. Further, Defendant argues that Plaintiff admitted, in his deposition, that he does not actually know whether fetal cells were used in the vaccine. ECF No. 34, PageID.1626.

14

But Plaintiff did connect his objection to the vaccine to a wider religious outlook—his belief that life begins at conception, and that God would hold him morally accountable for receiving a vaccine that was developed in part from cell lines derived from aborted fetuses. ECF No. 33-10. Title VII does not require Plaintiff to "explain how [his] religion has a specific tenet or principle that does not permit [him] to be vaccinated" with the COVID-19 vaccine. *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241, 1243 (6th Cir. 2024); *see also Sturgill*, 114 F.4th at 809.

Defendant cites many non-controlling cases from other Circuits for the proposition that Plaintiff's objection to the vaccination policy based on his opposition to abortion fails to demonstrate a religious belief, because he does not tie it to a wider religious observance, practice, or outlook.[4] *See* ECF No. 34, PageID.1626–27. However, the Court is not persuaded by the underlying logic of these cases. Of course, a plaintiff claiming a failure to accommodate is required to demonstrate a connection between their belief and some "religious principle" they

---

[4] In general, these cases found that an individual did not demonstrate a sincere religious belief against the use of fetal cells in the production of COVID-19 vaccines because the individual did not allege any "comprehensive religion—formal or informal—that drives the way he thinks about 'deep and imponderable matters,'" *See Winans v. Cox Auto., Inc.*, 669 F.Supp.3d 394, 401 (E.D. Pa. 2023), or explain how his belief system conflicts with the use of fetal cells in vaccines. *See Aliano v. Twp. of Maplewood*, No. 22-cv-5598, 2023 WL 4398493, at *10–*11 (D.N.J. July 7, 2023).

follow. *See DeVore*, 118 F.4th at 847. But courts "may not question the veracity of one's religious beliefs." *Sturgill*, 114 F.4th at 809. Thus, a plaintiff need not cite specific tenets of his religion that forbid the contested employment policy or explain how those tenets forbid it. *Id.*; *Lucky*, 103 F.4th at 1243–44. Indeed, "the claim of the [plaintiff] that his belief is an essential part of a religious faith must be given great weight." *Seeger*, 380 U.S. at 184; *see also Bass v. T-Mobile USA, Inc.*, No. 22-11975, 2024 WL 1315843, at *6 (E.D. Mich. Mar. 27, 2024).

Here, Plaintiff stated that he believes God will hold him morally accountable for taking a vaccine that used fetal cell lines in its manufacturing or testing, because, in his eyes, life begins at conception and should end at natural death. ECF No. 33-10. Thus, Plaintiff connected his beliefs to a "religious principle"—that life begins at conception, that people may not interfere with it before natural death, and that violating this premise makes a person accountable to God. *Cf. DeVore*, 118 F.4th at 847 (finding that plaintiff did not connect her belief that mandatory COVID-19 testing was "unfair" to any religious principle). That Plaintiff did not connect this principle to a wider set of religious convictions does not doom his claim as a matter of law. This belief alone is sufficient for Plaintiff to survive summary judgment. *See Speer*, 2024 WL 4370773, at *6 ("Courts routinely accept that opposition to vaccination based on purportedly religious concerns over abortion constitute beliefs that are religious on their face.").

16

Moreover, Defendant's claim that Plaintiff does not know whether fetal cells were used in COVID-19 vaccines misrepresents Plaintiff's position. During Plaintiff's deposition, defense counsel asked Plaintiff if he knows, in fact, whether the Moderna and Pfizer vaccines were manufactured with fetal cell lines. ECF No. 34-3, PageID.1658. Plaintiff responded "no," but that he made an assessment about the veracity of this issue by watching documentaries, reading things on X (formerly Twitter), and following the teachings of a "Dr. McCullough."[5] *Id.* at PageID.1658–59. In other words, Plaintiff simply admitted he has no firsthand knowledge about whether the vaccines involved the use of fetal cell lines, but that his research said they did, and he fashioned his beliefs based on this research. Whether Plaintiff's sources are reputable are of no moment, particularly where, as here, Plaintiff's sources gave him correct information and Plaintiff's objection to the vaccination policy is based on that information.[6]

The Court will next consider Plaintiff's remaining beliefs. Plaintiff argues that his other two beliefs— that he opposes being vaccinated against his will, and that

---

[5] Defendant points out that Dr. Peter McCullough is a discredited physician responsible for making false claims about the vaccine. ECF No. 38, PageID.2237.

[6] Plaintiff informed Defendant that he objected to the vaccination policy on the grounds that the available vaccines "used cell lines originating from aborted children in their *manufacturing* or *testing*." ECF No. 33-10, PageID.1357 (emphasis added). Johnson & Johnson developed and produced its COVID-19 vaccine using aborted fetal cell lines, and Pfizer and Moderna used aborted fetal cell lines while testing their vaccines for efficacy. See ECF No. 33-8.

his body is a temple— are both religious in nature, and to the extent he has secular motivations, they overlap with his religious motivations and do not preclude him from Title VII's protection. *See* ECF No. 33, PageID.1210; ECF No. 37, PageID.2033. Conversely, Defendant argues that Plaintiff's beliefs are rooted in personal preference and distrust for science, and that Plaintiff pretextually couched his beliefs in religious language to avoid the vaccine requirement. *See* ECF No. 34, PageID.1623–24.

These two beliefs are sufficient to survive summary judgment and need not be discussed in depth. *See Bass*, 2024 WL 1315843, at *5–*6. Although individually, these beliefs would not offer as strong of a case as Plaintiff's objection to fetal cells in the vaccine,[7] when they are considered together and in conjunction with Plaintiff's religious convictions against abortion, they adequately demonstrate

---

[7] The case law is not consistent regarding whether opposition to being vaccinated on the grounds that God gives individuals free will, or that the "body is a temple," is sufficiently "religious" for Title VII purposes. *Compare Bass*, 2024 WL 1315843, at *5–*6 (finding plaintiff's belief that he has the right to exercise his free will in accordance with his intellect, and that his religion "opposes" forced vaccination, sufficient to defeat summary judgment) *with Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465–66 (M.D. Pa. 2022) (finding plaintiff's belief that she has a "God given right to make her own choices" insufficient to defeat motion to dismiss); *compare Williams v. Blue Cross Blue Shield of Mich.*, No. 23-cv-12066, 2024 WL 1994258, at *3 (E.D. Mich. May 6, 2024) (finding plaintiff's belief that her body is her temple sufficient to defeat motion to dismiss) *with Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412, 418 (E.D. Pa. 2024) (finding plaintiff's belief that he should not "defile" his body insufficient to defeat summary judgment).

a religious belief that would be entitled to protection under Title VII. [8] *See Sturgill*, 114 F.4th at 810 (plaintiff's belief that her body is her temple sufficient to defeat motion to dismiss); *Bass*, 2024 WL 1315843, at *6 (plaintiff's "religious belief, practice, or observance" leading him to "object" to all vaccinations, and belief that he has a right to exercise free will, sufficient to defeat summary judgment).

While Plaintiff has demonstrated that his beliefs are religious, it is another question whether his beliefs are sincere. Although proving sincerity is generally "not a difficult hurdle, the factfinder need not take a plaintiff at his word." *Speer,* 2024 WL 4370773, at *6 (quoting *Ackerman*, 16 F.4th at 180–81)) (internal quotation marks and brackets omitted). Defendant has raised several reasons to question Plaintiff's sincerity, such as the fact that his religious reasoning was not consistent throughout his accommodation request process or in his deposition, or the fact that he described medical reasons for wanting to avoid the vaccine.[9] *See* ECF No. 34,

---

[8] Defendant argues that Plaintiff's belief that his "body is a temple" cannot be considered because Plaintiff did not inform it of this belief. ECF No. 34, PageID.1623. But the Court notes that Plaintiff informed Defendant of this belief by email in September 2021. *See* ECF No. 33-15, PageID.1404 ("[M]y faith also requires me to treat my body as a temple…") This email came after Defendant made its decision to reject Plaintiff's accommodation request, but before his job was actually terminated. The consequences of this fact need not be contemplated here, given that "the Court's determination would remain the same" regardless of whether it considers this belief. *See Bass*, 2024 WL 1315843, at *6.

[9] A person having both religious and medical objections to an employment policy does not mean he loses the protection of Title VII. *Sturgill*, 114 F.4th at 810. However, it is for a jury to decide if the religious objections are merely pretext for the medical objections. *Id.*

PageID.1623; ECF No. 34-3, PageID.1658. "[T]his evidence is not so overwhelming" as to warrant summary judgment here. *Speer*, 2024 WL 4370773, at *6. Plaintiff's credibility on the issue of his sincerity is for the jury's determination. *See Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (noting that credibility determinations and drawing inferences from facts are jury functions); *E.E.O.C. v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699 (M.D. Tenn. 2020) ("Summary judgment is seldom appropriate in subjective inquiries and… should be granted only where… the only conclusion a reasonable jury could make is that the employee's religious assertion was not bona fide.").

Therefore, the Court concludes that material questions of fact remain as to whether Plaintiff has a sincerely held religious belief.

### ii.     Undue Hardship

Next, the Court considers whether Defendant has established, as a matter of law, that it could not accommodate Plaintiff's beliefs without undue hardship.[10] *Tepper*, 505 F.3d at 514. "Title VII requires employers to reasonably accommodate an employee's religious beliefs, unless doing so would impose an 'undue hardship

---

[10] Because Defendant did not offer any accommodations to Plaintiff, there is no need to analyze the reasonableness of proposed accommodations. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) (noting that if an employer offers reasonable accommodations to an employee, a court need not determine whether the employee's alternative proposed accommodations would pose an undue hardship on the employer).

on the conduct of the employer's business.'" *Troutman v. Teva Pharms. USA, Inc.*, No. 6:22-cv-395-JDK, 2024 WL 3635303, at *9 (E.D. Tex. June 25, 2024) (quoting *Groff v. DeJoy*, 600 U.S. 447, 453–54 (2023)). The burden of proving undue hardship is on the employer. 42 U.S.C. § 2000e(j).

For nearly half a century, the Supreme Court interpreted "undue hardship" to mean "any effort or cost that is 'more than… *de minimis.*'" *Groff*, 600 U.S. at 453 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). However, the Supreme Court recently clarified that to demonstrate undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470. Courts must apply this test "in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (alterations in original). Thus, "[u]ndue hardship refers to more than just the economic cost of providing an accommodation. Employers may consider intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees." *Speer*, 2024 WL 4370773, at *10; *see also Savel v. MetroHealth System*, No. 1:22-cv-02154, 2024 WL 4581542, at

*11 (N.D. Ohio Oct. 25, 2024).[11] Furthermore, the employer does not necessarily need to prove the costs that it would have incurred if it provided an accommodation; "it is entitled to rely on its projections." *Speer*, 2024 WL 4370773, at *10.

Defendant's argument that it would suffer an undue hardship by accommodating Plaintiff relies on both economic and noneconomic factors. Defendant notes that Plaintiff's position as Warehouse Manager required him to work in person and have face-to-face interactions with his team and other employees, along with third party delivery drivers and vendors who may not have been masked or vaccinated. ECF No. 34, PageID.1628; ECF No. 34-4, PageID.1687. Defendant argues that, as such, Plaintiff's lack of vaccination posed a health and safety risk to other employees, their families, and the community. ECF No. 34, PageID.1629.

Moreover, Defendant maintains that as the only manager of the Warehouse, Plaintiff contracting COVID-19 would be potentially disastrous to its operations. *Id.* Because Plaintiff interacted with employees and third parties for his job, he was at risk of COVID-19 exposure, and if he were to get sick he would have longer

---

[11] There are two *Savel* opinions cited throughout this Opinion and Order. In the opinion cited here, the district court granted the defendant's motion for summary judgment after remand from the Sixth Circuit. Hereinafter, this opinion will be cited *Savel II*.

quarantine times because he was unvaccinated. ECF No. 34-4, PageID.1687.[12]

Defendant did not have others who could lead the Warehouse team aside from

Bryant Brown, who was also unvaccinated. *Id.*; ECF No. 41, PageID.2367 n.5. Thus,

considering Plaintiff's unique position, he would need to be vaccinated to ensure the

Warehouse's seamless operations. Defendant also argues that if Plaintiff contracted

COVID-19, it could spread through the whole Warehouse, "something that

[Defendant] could [not] manage." ECF No. 34-4, PageID.1687. Furthermore, at the

time, Defendant was dealing with the Delta-variant COVID surge, and Defendant

was trying to ensure it could keep its "doors open." *Id.* at PageID.1688.

Plaintiff challenges Defendant's assertions on several grounds. First, Plaintiff

notes that the majority of Defendant's workforce was not subject to the COVID-19

vaccination policy, including all of the Warehouse staff (besides Plaintiff and Bryant

Brown), so it is "disingenuous" to argue that Plaintiff's lack of vaccination

endangered other employees or guests. ECF No. 33, PageID.1217; ECF No. 37,

PageID.2042–03. Plaintiff also notes that Defendant never did a cost analysis to

determine the hardship it would incur if it continued to employ Plaintiff with

accommodations. ECF No. 37, PageID.2043. Plaintiff argues that he could have

---

[12] According to the deposition of Dana Howell, Defendant's Vice President of Legal
Counsel, the quarantine time for unvaccinated workers was ten days, whereas the
quarantine time for vaccinated workers was five days. ECF No. 33-12, PageID.1374.

simply worn a mask and social distanced, and he would have continued to perform his job satisfactorily with those accommodations. ECF No. 33, PageID.1216.

It is true that courts have found that safety risks to other employees, on their own, may constitute an undue hardship. *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975) ("[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business"); *Savel II*, 2024 WL 4581542, at *12 (collecting cases). The Court acknowledges that the COVID-19 pandemic was unprecedented, that employers were forced to make tough decisions about how best to protect their staff, and that—as Defendant states—the COVID-19 vaccine was considered the "gold star" for minimizing infection rates. *See* ECF No. 34, PageID.1618; ECF No. 34-4, PageID.1687. "But the undue burden test is not concerned with the wisdom of [Defendant's] vaccine mandate." *Hayslett v. Tyson Foods, Inc.*, No. 1:22-cv-1123-STA-jay, 2023 WL 11897503, at *13 (W.D. Tenn. Sept. 20, 2023). Rather, the question rests on whether Defendant can demonstrate that there was, indeed, a safety risk in these circumstances that could not be alleviated by an accommodation. *See id.*; *see also Adams v. Mass Gen. Brigham Inc.*, No. 21-11686, 2023 WL 6318821, at *8 (D. Mass. Sept. 28, 2023) (finding that at the summary judgment stage, defendant could not prove that a single accommodation or exemption to COVID-19 vaccine would have materially increased the risk of the spread of COVID-19).

Here, Defendant has not demonstrated that Plaintiff remaining unvaccinated would put its other employees or guests at any *meaningful* increased risk for COVID-19. Defendant glosses over the fact that 80% of its workforce was not subject to the COVID-19 vaccination policy and that Plaintiff and Bryant Brown were the *only* employees in the Warehouse who were required to be vaccinated.[13] *See* 33-3, PageID.1238, 1240. Defendant has not provided any evidence about actual vaccination rates among its unionized staff—indeed, it appears that evidence may not exist. *Id.* at PageID.1238 (deposition testimony of Rozell Blanks, Vice President of Human Resources (Midwest)). Thus, potentially every employee that Plaintiff interacted with could have been unvaccinated. Considering that Defendant bears the burden to prove undue hardship, Defendant needed to provide more evidence to support the notion that Plaintiff's lack of vaccination would meaningfully "jeopardize[]" Defendant's "mission to provide a safe and healthy environment" for

---

[13] Defendant argues that the Court cannot compare union employees to Plaintiff when determining whether Defendant has demonstrated an undue hardship. *See* ECF No. 38, PageID.2248. Although it is true that union employees are not considered "similarly situated" to nonunion employees under a *disparate treatment analysis*, *see Collias v. MotorCity Casino*, No. 2:22-cv-12650, 2023 WL 6406220, at *8 (E.D. Mich. Sept. 30, 2023), Defendant cited no case law to support the notion that the circumstances of union employees cannot be considered in determining whether an accommodation for a nonunion employee *would have been an undue burden*. The Court simply makes the commonsense observation that if 80% of Defendant's workforce is potentially unvaccinated, and almost all of Defendant's Warehouse staff is potentially unvaccinated, Plaintiff's lack of vaccination may make little difference to Defendant's staff's overall health and safety.

employees in order to prevail on this argument at the summary judgment stage.[14]

ECF No. 34, PageID.1629. For the same reasons, Defendant's argument that it could

not accommodate Plaintiff because it was trying to prevent another shutdown is

unavailing. Plaintiff's lack of vaccination alone, among many other unvaccinated

workers, may have done little to prevent another shutdown; Defendant has certainly

not demonstrated otherwise. *See Speer*, 2024 WL 4370773, at *12.

Defendant's other argument is that Plaintiff's absence, if sick, could be

disastrous to Warehouse operations. Both Plaintiff and Defendant agree that Plaintiff

held an important role in the Warehouse. *See* ECF No. 34, PageID.1618; ECF No.

34-3, PageID.1666. Defendant's Vice President of Legal Counsel, Dana Howell,

testified at her deposition that without Plaintiff there would be "no one to lead [the

Warehouse] team."[15] ECF No. 34-4, PageID.1687. Further, both Plaintiff and

Defendant agree that successful Warehouse operations are the key to Defendant's

business because the Warehouse supplies every other department with the items

---

[14] The Court finds the cases that Defendant cites in support distinguishable because of the existence of so many potentially unvaccinated individuals in this case and Defendant's lack of evidence about the impact Plaintiff's failure to vaccinate would have under these circumstances. *See* ECF No. 34, PageID.1629.

[15] This statement may be an exaggeration. Under the Warehouse Manager position is the Warehouse Supervisor position, formerly held by Bryant Brown. The Warehouse Supervisor could manage the Warehouse in the Warehouse Manager's absence. *See* ECF No. 34-5, PageID.1701. However, Brown also refused to get vaccinated and was terminated for the same reasons as Plaintiff. ECF No. 11. Defendant does not address whether it could have hired a new Warehouse Supervisor after Bryant Brown was let go.

needed to operate. ECF No. 34-3, PageID.1665; ECF No. 34-4, PageID.1687–88.
Thus, Defendant argues that to prevent workflow interruptions, it determined that
Plaintiff must be vaccinated. Plaintiff argues in response that because Defendant did
not engage in a cost analysis or otherwise substantiate these concerns, Defendant's
position is nothing more than a "speculative attorney argument." ECF No. 37,
PageID.2043.

Notably, Defendant need not necessarily "prove that the costs of providing an
accommodation are certain to occur." *Speer*, 2024 WL 4370773, at *10. Defendant
supported its argument with Plaintiff's and Dana Howell's deposition testimonies.
The inference from these testimonies is that Plaintiff's potential illness could cause
him to miss work, "thereby impacting operations and presumably increasing
[Defendant's] costs." *Hayslett*, 2023 WL 11897503, at *13. Yet, "how much it
actually increased costs Defendant[] ha[s] not said." *Id.* Aside from the conclusory
statements in Dana Howell's deposition testimony, it is not possible for the Court to
contextualize whether these costs would be substantial to Defendant in *relation* to
its overall business. *See Speer*, 2024 WL 4370773, at *11–*12 (finding defendant
did not prove undue hardship at summary judgment stage where defendant provided
no context for the court to gauge whether its purported costs would be substantial).
Prevailing in summary judgment requires more than a "mere scintilla of evidence."
*Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Under *Groff*'s new

27

"substantial increased costs" test, and considering that Defendant has the burden of proof, Defendant needed to show more at the summary judgment stage to establish that the hardship it would suffer would be *substantial*, not simply "more than… *de minimis*."[16] *Groff*, 600 U.S. at 453, 470.

While Defendant is not entitled to summary judgment on the issue of undue hardship, the Court cannot conclude that as a matter of fact and law, Defendant would *not* have suffered undue hardship if it were to have accommodated Plaintiff. Defendant provided reasons that accommodating Plaintiff would have caused an

---

[16] The Court finds distinguishable the cases Defendant cites in support. Two of the cases it cites involve medical professionals who refused to be vaccinated, posing special risks of exposure and danger to vulnerable patient populations not present in this case—particularly considering that Plaintiff did not interact with guests in his role as Warehouse Manager. *MacDonald v. Or. Health & Science Univ.*, No. 3:22-cv-01942-IM, 2024 WL 3316199, at *11–*12 (D. Or. July 5, 2024); *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 175–76 (E.D. Pa. 2023). Another case it cites involves an actress who refused to be vaccinated while filming a television show. Notably, however, the defendant in that case provided ample cost analysis substantiating its claim of undue hardship. *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1127–28 (C.D. Cal. 2023). Defendant cites a Sixth Circuit case finding that potential loss of production was an undue hardship. But the court specifically based its opinion on the now-overruled "more than *de minimis*" standard. *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir. 1994) ("Title VII does not require an employer to bear more than a *de minimis* cost… [R]isking the loss of production would have entailed more than a *de minimis* cost."). Finally, Defendant cites an Eastern District of Kentucky case which found that an employee who had an important administrative job could not be accommodated without undue hardship. But the accommodations at issue in that case were the employee's request for *fully* remote work or to hire another employee. *DeVore v. Univ. of Ky. Bd. of Trustees*, 693 F. Supp. 3d 757, 765–66 (E.D. Ky. 2023). Here, Plaintiff's requests were for masking, social distancing, or remote work "when available." ECF No. 33-7.

undue hardship, and they are legitimate reasons. The problem is that the record "is [not] so one-sided that [Defendant] must prevail as a matter of law." *Anderson*, 477 U.S. at 252. "The fact that the… decision[] made by [Defendant] may have been entirely reasonable does not necessarily mean that [granting] a single [accommodation] would create… hardship." *Adams*, 2023 WL 6318821, at \*8. Ultimately, it is the function of the jury to determine the weight it should give to Defendant's assertion that it would have suffered an undue hardship by accommodating Plaintiff. *Payne*, 767 F.3d at 530.

For the foregoing reasons, the Court finds that neither Plaintiff nor Defendant are entitled to summary judgment on Plaintiff's failure to accommodate claim.

### c. Disparate Treatment

In addition to prohibiting an employer from failing to accommodate an employee's religion, Title VII also prohibits an employer from subjecting religious employees to disparate treatment because of their religion. 42 U.S.C. § 2000e-2(a). Similarly, the ELCRA prohibits employers from discriminating against an employee on the basis of religion, including by treating an employee differently because of his religion. MICH. COMP. LAWS § 37.2202(1)(a); *Wilcoxon v. Minn. Mining & Mfg. Co.*, 235 Mich. App. 347, 358 (1999). To prevail on a claim of disparate treatment under Title VII, the plaintiff must "either present direct evidence of discrimination" or "present a prima facie case of indirect discrimination." *Tepper*, 505 F.3d at 515. To

establish his prima facie case, Plaintiff must show: "(1) that he was a member of a protected class, (2) that he experienced an adverse employment action, (3) that he was qualified for the position, and (4) that he was replaced by a person outside the protected class or that he was treated differently than similarly situated employees." *Id.* A disparate treatment claim under the ELCRA is "analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Collias*, 2023 WL 6406220, at *7.

If the plaintiff establishes his prima facie case, "the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action." *Tepper*, 505 F.3d at 515. "If the defendant meets this burden, then the burden shifts back to the plaintiff who must show that the defendant's proffered reason is a pretext for discrimination." *Id* at 515–16.

### i.   *Prima Facie Case – Similarly Situated Employee*

Here, Plaintiff has satisfied the first element of his prima facie case. As a Christian, he belongs to a protected class. *See Lindsey v. Bridge Rehab, Inc.*, 369 F. Supp. 3d 1204, 1211 (N.D. Ala. 2019) (concluding that the Christian plaintiff was a member of a protected class). Furthermore, the parties do not dispute that Plaintiff was subjected to an adverse employment action and that he was qualified for the position from which he was ultimately fired. Thus, the only element of the prima

facie case at issue is whether he was treated differently than similarly situated employees.[17]

To demonstrate that employees are "similarly situated," a plaintiff "must show that the 'comparables' are similarly-situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original). This may mean that the employees "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* However, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather… the plaintiff and the employee with whom the plaintiff seeks to compare himself… must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F. 3d 344, 352 (6th Cir. 1998) (emphasis in original). Courts "should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*

Plaintiff argues that the Dealer Trainee in Defendant's gaming department—to whom Defendant granted a medical accommodation—was "similarly situated" to

---

[17] Plaintiff cannot argue that he was replaced by someone outside his protected class because he does not know the religion of the person who replaced him. ECF No. 34-3, Page ID.1672.

Plaintiff, and that medical accommodations may be used to demonstrate religious discrimination in the disparate treatment context. ECF No. 33, PageID.1218. Plaintiff further argues that he is similarly situated to the Dealer Trainee because they were subject to the same vaccine requirement, the same accommodation request process, and the same decisionmaker on those requests. *Id.* at PageID.1219. Defendant responds by arguing that Plaintiff is not similarly situated to the Dealer Trainee. ECF No. 34, PageID.2252. It states that there were differentiating and mitigating circumstances distinguishing Plaintiff and the Dealer Trainee, "including job duties, location within the property, and when the accommodation was requested." *Id.* at PageID.2253. Further, Defendant notes that Plaintiff and the Dealer Trainee's respective requests were evaluated under different legal standards. ECF No. 41, PageID.2370.

Ultimately, Plaintiff is unable to show that the Dealer Trainee was similarly situated to him. Plaintiff argues that he was similarly situated to the Dealer Trainee because he was subject to the same COVID-19 policy, the same accommodation request process, and the same decisionmaker. ECF No. 33, PageID.1220 (citing *Bey v. Pocono Med. Ctr.*, No. 3:23-cv-688, 2024 WL 1977986, at *8 (M.D. Pa. May 3, 2024)). But the Court is by no means required to find that Plaintiff and the Dealer Trainee are similarly situated based on those facts alone. *See Ercegovich*, 154 F. 3d at 352. Indeed, under this standard, Plaintiff would be "similarly situated" to every

32

nonunion employee in the company, ignoring major differences like job title, job duties, seniority, and the like.

Rather, the circumstances surrounding the two accommodation requests were different. Plaintiff was a Warehouse Manager, who played an important role running the Warehouse and whose absence may have caused workflow issues. ECF No. 34-4, PageID.1687. There is no evidence that a Dealer Trainee plays such an important role in the company or in his department, or that his absence would have been as detrimental to Defendant. Indeed, the Dealer Trainee was a new hire, whereas Plaintiff was a seasoned 20-year employee in a leadership position. ECF No. 33-17, PageID.1411; ECF No. 33-6, PageID.1287. There is also no evidence that Plaintiff and the Dealer Trainee reported to the same supervisors or had any similar or overlapping duties in their jobs. *See Mitchell*, 964 F.2d at 583. Moreover, the Court notes that the Dealer Trainee was partially vaccinated, having received the first dose of his COVID vaccination but not the second because he developed Bell's palsy. ECF No. 33-18, PageID.1441. Plaintiff, in contrast, was totally unvaccinated.

Furthermore, the fact that the Dealer Trainee made a medical accommodation request, whereas Plaintiff made a religious accommodation request, is an important distinction. "Medical exemption requests and religious exemption requests are on their face fundamentally different." *Savel II*, 2024 WL 4581542, at *13. In particular, Defendant had to evaluate religious accommodation requests and medical

accommodation requests under different legal standards. At the time, Defendant was analyzing religious accommodation requests under the ADA's "significant difficulty or expense" standard, whereas it was analyzing religious exemption requests under *Hardison*'s now-overruled "more than *de minimis*" standard. ECF No. 41, PageID.2370; *Speer*, 2024 WL 4370773, at *13; *Groff*, 600 U.S. at 471. But even considering the new "substantial increased costs" test laid out in *Groff*, "[t]he ADA and Title VII… continue to have different accommodation standards." *Speer*, 2024 WL 4370773, at *13; *Groff*, 600 U.S. at 471 (refusing to adopt the ADA's standard in the religious accommodation context). "It is not disparate treatment to apply different legal standards to different types of accommodation requests." *Speer*, 2024 WL 4370773; *see also Abbawi v. Henry Ford Health Sys.*, No. 22-13008, 2024 WL 3654063, at *5 (E.D. Mich. Mar. 6, 2024) (finding that the scope of interrogatories should be limited to religious exemptions and exclude medical exemptions in a discovery dispute related to religious disparate treatment claim).

While Plaintiff argues that courts regularly find granted medical accommodations to be evidence of religious disparate treatment discrimination, the cases he cites for this proposition were at the Rule 12(b)(6) motion to dismiss stage. *See Savel v. MetroHealth Sys.*, 96 F.4th 932, 944 (6th Cir. 2024);[18] *Gorski v.*

---

[18] In this opinion, the Sixth Circuit held that at the pleadings stage, disparate treatment of religious and nonreligious accommodation requests is sufficient to

34

*Ascension St. John Hosp.*, No. 2:22-cv-13009, 2024 WL 1327904, at *3 (E.D. Mich. Mar. 25, 2024); *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114–15 (8th Cir. 2024) (finding that granted medical exemptions are sufficient to survive motion to dismiss on religious disparate treatment claim, noting that "courts generally do not inquire about comparators until summary judgment"). Indeed, the Sixth Circuit has held that a plaintiff need not plead a prima facie case to survive a motion to dismiss on a disparate treatment claim, making these cases less persuasive at the summary judgment stage where the prima facie case is required. *Savel I*, 96 F.4th at 944.

Plaintiff also cites *Troutman*, which found that because the defendant "granted medical exemption requests to at least one similarly situated employee," it could not grant defendant's motion for summary judgment on the plaintiff's employment retaliation claim. *Troutman*, 2024 WL 3635303, at *12. Here, however, disparate treatment is in issue. Furthermore, as explained above, there is no evidence that Plaintiff and the Dealer Trainee are similar in any other respects. Finally, Plaintiff cites *Adams v. Mass Gen. Brigham Inc.* in support, but that case only pertains to failure to accommodate religious belief, not whether parties are "similarly situated" for disparate treatment purposes. *Adams*, 2023 WL 6318821, at *1, *7–*8. In sum,

---

survive a motion to dismiss, and reversed and remanded the district court's ruling otherwise. *Savel I*, 96 F.4th at 944. Hereinafter, this opinion will be cited as *Savel I.*

none of the sources that Plaintiff cites in support of his argument persuade the Court that he has established his prima facie case.

Considering that Plaintiff's and the Dealer Trainee's accommodation requests were fundamentally different in nature, along with the lack of evidence that Plaintiff and the Dealer Trainee were similar in "all of the *relevant* aspects," Plaintiff has failed to satisfy his prima facie case for disparate treatment. *See Ercegovich*, 154 F. 3d at 352 (emphasis in original).

### ii.    Pretext

Even if the Court were to find that Plaintiff established a prima facie case, his case would ultimately fail because he has not established that Defendant's "legitimate, nondiscriminatory reason" for firing him is pretextual.[19] *Tepper*, 505 F.3d at 515. A plaintiff may demonstrate pretext "in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). In all cases, a plaintiff must show that "it was the *religious* aspect" of his actions that "motivated [his] employer's actions." *Hall v. Baptist Mem'l Health Care Corp.*, 215

---

[19] Given that neither party disputes whether Defendant's reason for dismissing Plaintiff is a "legitimate, nondiscriminatory reason"—the next step of the disparate treatment analysis where the burden shifts to Defendant—the Court presumes that the parties agree that Defendant would have satisfied that burden. Thus, the burden shifts back to Plaintiff to demonstrate pretext. *Tepper*, 505 F.3d at 515.

F.3d 618, 627 (6th Cir. 2000) (emphasis in original). "[A]t bottom[,] the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n.4.

An employer is entitled to summary judgment where "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or [where] the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Plaintiff argues that he has conclusively established pretext. ECF No. 33, PageID.1221. He states that a "work rule" defense—where the employer was simply following policy—may be found pretextual where "other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999). This is because an employer's departure from established policies "raises a question regarding the credibility of an employer's reliance on the work rule." *Strickland v. Prime Care of Dothan*, 108 F. Supp. 2d 1329, 1335–36 (M.D. Ala. 2000). Thus, according to Plaintiff, a jury would have to find that his termination was pretextual because of the one medical accommodation request that Defendant granted, and

because union employees were exempted from the vaccination policy. ECF No. 33, PageID.1221.[20]

Defendant argues in response that it never departed from its own established policies; its policy permitted individual employees to make accommodation requests, and it granted accommodation requests after an individualized assessment. ECF No. 38, PageID.2254. Furthermore, the union employees were never subject to the vaccination policy because it could not impose a new policy on the union unilaterally. *Id.* In all, Defendant argues that Plaintiff was informed he would lose his job if he did not comply with the vaccination policy, Plaintiff chose not to receive the vaccine, and Defendant subsequently terminated him for noncompliance— religion had "nothing to do with the decision." ECF No. 34, PageID.1633.

To show pretext, Plaintiff was required to demonstrate that "it was the *religious* aspect" of his actions that "motivated [his] employer's actions." *Hall*, 215 F.3d at 627 (emphasis in original). Here, Plaintiff has made "no additional evidentiary showing" that Defendant's reasons for denying his accommodation request and his subsequent firing were motivated by anything other than the reasons Defendant provided. *Id.* Plaintiff himself admits that he was subject to the

---

[20] In addition to this argument, Plaintiff states that other acts of discrimination, or a pattern or practice of discrimination, may be evidence that a defendant's "legitimate, nondiscriminatory reason" is pretextual. *See* ECF No. 33, PageID.1221. However, Plaintiff has not presented any argument or evidence to demonstrate that Defendant has engaged in other acts of discrimination.

vaccination policy, that it applied to everyone regardless of religion, and that his failure to follow the policy is the reason he was fired. ECF No. 33-6, PageID.1290, 1308, 1311. Thus, aside from Plaintiff's mere speculation that these adverse employment actions were the result of intentional religious discrimination, there is no evidence that Defendant's explanations are pretextual.

Moreover, Plaintiff's argument that Defendant departed from its "work rule" is flawed because Defendant *did not depart* from any of its established policies when it granted the single medical accommodation to the Dealer Trainee. Rather, Defendant always reserved the right to make accommodations—compliant with its obligations under the law—after conducting an individualized assessment on the person who requested the accommodation. *See* ECF 33-2. Furthermore, the union employees were never subjected to a vaccination policy to begin with because Defendant was legally foreclosed from forcing the policy on those workers. *Id.*; ECF No. 33-3, PageID.1238; ECF No. 34, PageID.1614 n.5. Thus, Plaintiff's reliance on the "work rule" argument does not lend support to his position.

Thus, even if the Court found that Plaintiff established his prima facie case, his disparate treatment claims would ultimately fail for failure to establish pretext. As such, the Court determines that Defendant is entitled to summary judgment on Plaintiff's disparate treatment claims under Title VII and the ELCRA.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [#33] is

**DENIED**, and Defendant's Motion for Summary Judgment [#34] is **DENIED IN**

**PART** and **GRANTED IN PART.** Specifically, Defendant's Motion as it pertains

to Count I [Failure to Accommodate] is **DENIED**. Defendant's Motion as it pertains

to Counts II and III [Disparate Treatment under Title VII and the ELCRA] is

**GRANTED.**

**SO ORDERED.**

Dated:  November 18, 2024                    /s/Gershwin A. Drain
                                                              GERSHWIN A. DRAIN
                                                              United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 18, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager